J-A25008-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: I.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY | : | |
| OFFICE OF CHILDREN, YOUTH AND | : | |
| FAMILIES | : | |
| | : | |
| | : | |
| | : | No. 548 WDA 2021 |

Appeal from the Order Entered April 8, 2021,
in the Court of Common Pleas of Allegheny County,
Orphans' Court at No(s): CP-02-AP-0000102-2020.

BEFORE: KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.: **FILED: JANUARY 25, 2022**

In this matter, the Allegheny County Office of Children, Youth and Families (CYF) appeals the denial of its petition to involuntarily terminate the parental rights of (Mother) as to her 10-year-old son, I.M. (the Child).[1] CYF filed its petition pursuant to Sections 2511(a)(2), (5), (8) and (b) under the Adoption Act. The orphans' court determined CYF established the grounds for termination under Section 2511(a), but that CYF failed to provide clear and convincing evidence that termination best served the Child's needs and welfare under Section 2511(b). Thus, the court concluded CYF failed to meet the second prong of the bifurcated termination analysis. The court denied

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The identity of the Child's biological father could not be established during the proceedings below. CYF petitioned for the termination of the "unknown father," and the orphans' court granted the same.

CYF's petition, and CYF appealed. After careful review, we discern no abuse of discretion and affirm.

The record discloses the family's decade-long involvement with CYF. The Child was born in July 2010, and the family came to the attention of CYF soon after. Mother and the Child had been residing in the home of Mother's Maternal Cousin at the time of the Child's birth. Mother then moved into temporary housing run by Catholic Charities. CYF received a report that Mother was intoxicated at the temporary housing location, and that the Child was left in the care of Maternal Cousin. CYF determined that the report necessitated no further investigation.

In January 2011, CYF received a report that Mother was being rough and neglectful with the Child. At the time, Mother expressed a desire to participate in alcohol treatment. CYF referred Mother for mental health treatment and closed its case.

In September 2013, CYF learned that Mother continued to abuse alcohol and attempted suicide while intoxicated. She reported that she had been attending mental health treatment but stopped taking her medication. Mother entered inpatient care at Western Psychiatric Institute and Clinic, during which time the Maternal Cousin cared for the Child. By January 2014, Mother had recommitted herself to her recovery, and CYF again closed its case.

In September 2015, CYF became involved after Mother was hospitalized for alcohol and mental health issues. CYF was also concerned that the Child was missing school. Mother was diagnosed with major depressive disorder

and was recommended for outpatient treatment. CYF closed its case in October 2015.

In January 2018, CYF learned that Mother attempted suicide while Child was at school. Mother refused to re-enter treatment because she reportedly disliked group therapy and preferred individual treatment. Mother was diagnosed with post-traumatic stress disorder, bipolar disorder, major depressive disorder, and anxiety. Mother also acknowledged consuming alcohol and marijuana. CYF offered services and closed its case in June 2018. In August 2018, CYF reopened its case, accepted the family for services, and closed the case again in October 2018.

In November 2018, Maternal Cousin petitioned for custody of the Child in the Family Division of the Allegheny County Court of Common Pleas, but the court denied the request because Maternal Cousin lacked standing under the Child Custody Act. *See* 23 Pa.C.S.A. § 5324 ("Standing for any form of physical or legal custody").

After at least six separate interactions with Mother, CYF received the report that ultimately led to the Child's removal from Mother's care. In January 2019, the Child's school observed marks on the Child. The Child reported that Mother had struck him with an electrical cord. CYF obtained an order for emergency protective custody, and the Child was placed in foster care. Mother was charged with simple assault, endangering the welfare of a child, and recklessly endangering another person.

CYF petitioned to adjudicate the Child dependent on January 24, 2019. Mother was admitted to the hospital a week later, and she informed CYF she was prescribed antidepressants. On February 25, 2019, Mother stipulated to the Child's dependency. The dependency court placed the Child with Maternal Cousin, and ordered Mother to comply with the following reunification goals: Mother was to participate in a dual (drug and mental health) assessment; comply with any recommendations; begin parenting classes; and maintain employment. The court also ordered CYF to facilitate the Child's tutoring and trauma-based therapy. In March 2019, the Criminal Division of the Allegheny County Court of Common Pleas ordered Mother to have no contact with the Child. The order was lifted in May 2019. Thereafter, Mother could visit the Child in a "coached visitation" setting. Through the rest of 2019, the dependency court determined Mother was moderately compliant with the reunification plan.

In January 2020, Mother resolved her criminal case by completing a parenting class, ten sessions of anger management, and by pleading guilty to summary harassment. The Commonwealth withdrew the other charges.

At the onset of the Covid-19 pandemic in March 2020, Mother's compliance remained moderate. While Mother complied with some aspects of the reunification plan, she had stopped attending treatment consistently. Due to Covid concerns, Mother's in-person visitations were changed to liberal, teleconference visitations.

CYF filed its termination petition in July 2020. Thereafter, the court directed CYF, Mother, and Maternal Cousin to discuss whether, in lieu of terminating Mother's rights, Permanent Legal Custodianship might be suitable. The court also ordered Mother to undergo an evaluation with psychologist Dr. Terry O'Hara. On September 22, 2020, Dr. O'Hara conducted an interactional evaluation with the Child and Mother followed by an individual evaluation of the Child. On October 5, 2020, Dr. O'Hara conducted an individual evaluation of Mother followed by an interactional evaluation with Mother and the Child.

On November 30, 2020, the orphans' court held a hearing on CYF's termination petition. After the hearing, the court directed the parties to submit findings of fact and conclusions of law. On April 1, 2021, the court entered its order denying the termination petition. While the court determined CYF established grounds for termination under Section 2511(a)(2), (5), and (8), the court concluded that termination would not best serve the Child's need and welfare under Section 2511(b).

CYF timely filed this appeal, and presents one issue for our review:

> Did the orphans' court err as a matter of law and/or abuse its discretion by failing to fully address what would best serve the Child's needs and welfare pursuant to 23 Pa.C.S.A. § 2511(b).

CYF's Brief at 5.

We begin our review, mindful of our well-settled standard of review of termination decisions:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.,* 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Here, the trial court found that statutory grounds for termination existed under Section 2511(a)(2), (5), and (8).[2] Mother does not contest those findings, and thus all agree CYF met the first prong of the bifurcated analysis.

_____

[2] Section 2511(a) provides, in relevant part:

> **(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> >
> > (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
> >
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(2), (5), (8).

This appeal is about whether CYF met the second prong of the analysis.

Section 2511(b) states in relevant part:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. […].

23 Pa.C.S.A. § 2511(b).

This Court has explained the application of Section 2511(b) as follows:

> [S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.,* 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Concerning the bond, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship. *See C.M.K.*, 203 A.2d at 264 (citation omitted); *see also K.Z.S.*, 946 A.2d at 764 (holding there was no bond worth preserving where the child

had been in foster care for most of the child's life, which caused the resulting bond to be too attenuated). We add, the court is not required to use expert testimony to resolve the bond analysis but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

Finally, we emphasize that "[w]hile a parent's emotional bond with her her child is a major aspect of the [Section 2511(b)] best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted). "The trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have **with the foster parent**." *Id.* (quoting *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010)) (emphasis added).

With these principles in mind, we observe the rationale of the orphans' court as to why termination was not warranted under Section 2511(b). In its opinion filed pursuant to Pa.R.A.P. 1925(a), the orphan's court stated:

> In the instant case, this court considered the evidence and testimony presented and found that CYF failed to demonstrate, clearly and convincingly, that termination would meet the needs and welfare of the Child. The evidence presented and submitted to this Court instead proved that the Child had an emotional bond with his Mother, and that permanently severing that bond would have a detrimental impact on the Child.

Trial Court Opinion (T.C.O.), 6/16/21, at 16.

The court explained that of CYF's nine witnesses, only two testified about the status of the bond between Mother and the Child. *Id.* at 17. One witness was the CYF caseworker. However, the orphans' court placed little weight on the caseworker's testimony, because the caseworker had only seen the Child and Mother together on one occasion. *Id.* And the caseworker testified that the Child expressed excitement and a desire to see Mother. *Id.* The caseworker also testified that the Child would be disappointed if he did not have a relationship with his Mother. *Id.* at 18 (citation to the record omitted).

Although the caseworker further testified that there had been large gaps of time where Mother and the Child did not have contact, and that these gaps could strain their bond, the orphans' court was not persuaded by this testimony. The court explained that Mother's ability to visit with the Child was twice thwarted. Visitation between Mother and the Child was delayed first by the criminal court's March 2019 no-contact order, which was ultimately lifted by June 2019 (with the charges ultimately being withdrawn after Mother's summary harassment guilty plea). Then, visitation was stifled by the arrival of the Covid-19 pandemic, from March 2020 until September 2020, when in-person visitation could resume.

The orphans' court ultimately found that Mother had approximately 19 formal visits during the 11 months when Mother could have been fairly expected to see the Child. *Id.* at 19. Importantly, the court determined that these 19 visits did not account for numerous other, informal visits that were coordinated between Maternal Cousin and Mother. The court pointedly

- 10 -

observed that CYF could not provide testimony as to this figure. Finally, the court did not infer that the visitation gaps had a significant negative effect on the parental bond, because the court observed that the Child and Mother resided together from the Child's birth in July 2010 until the Child's removal in January 2019. In other words, the court determined that this bond was fairly resilient, and could withstand some separation, given their history.

The only other witness who testified about the status of the parent-child bond was Dr. O'Hara, who conducted the expert evaluations. The orphans' court determined the following:

> Regarding the emotional bond between Mother and the Child, Dr. O'Hara testified that the Child "values his relationship with Mother." During the interactional [evaluation,] Mother praised the Child. The Child "happily greeted his Mother," "showed affection to her," and was "enthusiastic" to see her. Mother also appeared very depressed and subdued during the interactional, and at times was not engaging with the Child. When Dr. O'Hara asked her about her disengagement Mother explained that it was difficult to relive her past and felt "slandered" by CYF. The Child was concerned about Mother, was attuned to her, asked if she was feeling better, and said he would pray for her. Dr. O'Hara viewed this negatively as the Child responding to Mother's needs as opposed to the parent responding to the Child's needs. And although Dr. O'Hara may be correct this was not positive, it was evidence that the Child has an emotional bond with Mother.
>
> Regarding the effect on the Child of permanently severing the emotional bond between the Child and Mother, when Dr. O'Hara was asked what he believed would happen if [the Child] were not to see his Mother again, Dr. O'Hara said "I think certainly there would be some detriment for [the Child.] [The Child] seems like he values his relationship with his Mother." Dr. O'Hara goes on to testify that he thinks the child would benefit from a relationship with his

Mother with certain conditions [in] place. And when asked directly if permanently severing the bond between the Child and Mother will be detrimental to the Child, Dr. O'Hara answers "I believe so, yes." Throughout his testimony, Dr. O'Hara does discuss that the adverse effect of permanently severing the bond between the Child and Mother may be mitigated by the lack of a relationship the Child currently had with Mother due to the lack of time the Child had spent with Mother since he was removed from her care, and Mother's inability to address her drug, alcohol, and mental health needs. However, Dr. O'Hara's opinion regarding the amounts of visits Mother has had with the Child relies on information received from an in-home service caseworker which as stated above may not be accurate considering the contributing factors that affected Mother's visits with the Child. Furthermore, Dr. O'Hara himself states that "[i]t's tough to say" the degree of adverse effect on the Child of permanently severing the emotional bond between the Child and his Mother. But what is certain is there will be an adverse effect.

[***]

In the case at hand, the evidence clearly established that if the emotional bond between [Child] and his Mother was permanently severed, then [Child] would be adversely affected. Therefore, this court was within its discretion when it denied CYF's petition to terminate Mother's parental rights.

T.C.O. at 20-22 (citations to the record omitted).

Thus, the orphans' court determined that Mother and the Child had a bond worth preserving, and that severance of that bond would not best serve the Child's needs and welfare.

On appeal, CYF claims that the orphans' court decision lacked competent evidentiary support and was thus an abuse of discretion. CYF's argument relies heavily on the testimony of Dr. O'Hara, who ultimately recommended that the court terminate Mother's rights. CYF contends the court "completely

ignored all of the doctor's testimony" regarding the benefits of termination and adoption by the Maternal Cousin, and that "Dr. O'Hara testified unequivocally that adoption by [Maternal Cousin] was the best possible outcome for [Child]." *See* CYF's Brief at 25-26. CYF argues the orphans' court "simply relied on the very few specific sections of Dr. Terry O'Hara's testimony when the doctor was reviewing the pros and cons of termination." *See id.* at 25.

In resolving CYF's arguments, we recognize our Supreme Court's recent decision in *Interest of S.K.L.R.*, 256 A.3d 1108 (Pa. August 17, 2021). In *S.K.L.R.*, the High Court addressed the appropriate standard of appellate review when a trial court denies an agency's termination petition. In that case, the trial court denied the petition brought by the Westmoreland County Children's Bureau on the basis that the agency failed to present sufficient evidence. The agency appealed the denial. This Court reviewed the record, determined that the facts supported termination, and we concluded that the trial court erred by finding that the agency failed to prove by clear and convincing evidence that termination was warranted. We directed the trial court to enter a termination decree. The mother then filed a petition for the allowance of appeal with our Supreme Court. The High Court concluded that we exceeded our appellate review, and it reinstated the trial court's order denying the termination petition.

Importantly, the Supreme Court clarified certain aspects of our abuse-of-discretion standard regarding termination decisions. As a matter of first

- 13 -

impression, the Supreme Court decided whether the general principles that the Court had delineated in a prior dependency case should also apply to termination proceedings. *S.K.L.R.*, 256 A.3d at 1123 (citing *In re R.J.T.*, 9 A.3d 1179 (Pa. 2010)).[3] The Court held unanimously that the same principles governing a dependency case "should be employed with equal force to the review of trial court termination decisions." *Id*. The Court reasoned that, "[j]ust as in the dependency setting, this abuse-of-discretion standard of review is crucial in termination proceedings, as appellate courts 'are not in a position to make close calls based on fact-specific determinations.'" *Id.* (quoting *R.J.T.*, 9 A.3d at 1190). The Court explained that the role of trial courts in termination proceedings shares many similarities to the part they play in goal-change matters:

> (1) Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved; (2) appellate courts, therefore, should defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the

---

[3] *R.J.T.* involved a specific dependency proceeding, the goal-change hearing. There, the agency sought to change the goal of the dependency case from reunification with the parent to adoption by the foster parents. The trial court denied the agency's request. On appeal, the Court concluded that the trial court abused its discretion; we opined the decision was a "very close call," but that the record supported the goal change to adoption. But our Supreme Court held that we misapplied the abuse-of-discretion standard, and it reinstated the trial court's denial. *See R.J.T.*, 9 A.3d at 1188-90. Put plainly, in *S.K.L.R.*, the Supreme Court held that its rationale from *R.J.T.* (concerning dependency proceedings) applies equally to termination proceedings.

likelihood of success of the current permanency plan; and (3) even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

*Id.* at 1123-1124 (citing *R.J.T.*, 9 A.3d at 1190) (internal quotations omitted).

The Supreme Court ultimately held that "[w]hen a trial court makes a 'close call' in a fact-intensive case involving a goal change or the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether the evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court." *Id.* at 1124.

In this case, we conclude that adherence to this abuse-of-discretion standard requires us to affirm the trial court's decision. To be sure, the record supports a contrary finding; relatedly, we also note that counsel for the Child advocated for termination. *See* N.T., 11/30/20, at 20. But as our Supreme Court made clear, our appellate role is not to scour the record for contrary facts and then substitute our judgment for that of the orphans' court. Rather, our responsibility is to review the record to see whether the evidence supports the orphans' court's decision.

Instantly, although the bond question is only one consideration in a Section 2511(b) analysis, the status of the parental bond was what ultimately informed the court's denial of the petition. All agree that a bond between Mother and the Child existed. The question was whether that bond was worth preserving or whether termination would "destroy this existing, necessary and

beneficial relationship." *See C.M.K.*, 203 A.2d at 264. The orphans' court determined that this bond was worth preserving. On appeal, we review whether the record supports that determination. We find that it does.

Contrary to CYF's characterization of the expert testimony, Dr. O'Hara was not unequivocal in his recommendations. As the orphans' court noted in its Rule 1925(a) opinion, Dr. O'Hara was certain that the Child would experience some detriment if the parental bond was severed. How much detriment depended on a couple of mitigating factors. One factor was the extent the Child had gone without seeing Mother, as the parental bond becomes attenuated when children who go prolonged periods without seeing their parents. *See* N.T., at 96. Another factor was the Child's relationship with his foster mother, the Maternal Cousin; children who are in nurturing foster homes are better able to manage the stress that a termination would bring. *See id.*

Ultimately, the orphans' court was not persuaded that these factors would actually mitigate the negative effects that the Child was certain to face. Regarding Mother's visitation gaps, the court was not convinced that anyone, including Dr. O'Hara, had an accurate understanding of how frequently Mother and the Child visited. Without an accurate understanding of the number of visits, it follows that Dr. O'Hara could not offer a clear prognosis about the Child's ability to overcome the severance of the parental bond. The precise number of visits was not dispositive in any event, because the orphans' court placed considerable weight on the Child's displays of affection toward Mother,

and how the Child valued his relationship with Mother, even at the end of the dependency proceedings. In other words, the court determined that even if the parental bond had suffered throughout the dependency proceedings, what remained was still worth preserving. While the record equally supports a contrary determination, we conclude that the orphans' court operated within its discretion when it rendered this finding.

Regarding the second mitigating factor, namely the Child's relationship with Maternal Cousin, CYF argues that the orphans' court discounted the benefits of this relationship. *See* CYF's Brief at 31. Here too, we fail to discern the abuse of discretion. First, it is squarely within the orphans' court's purview to weigh evidence and make credibility determinations. Second, while this Court has held that the lower court can equally emphasize the relationship between a child and the foster parent, we have not required the court to do so. *See N.A.M.*, 33 A.3d at 103. (citation omitted).

In sum, the orphans' court decision was predicated on its weighing of the testimony and evidence. Although the record supports the opposite decision, this fact alone does not constitute an abuse of discretion. We echo the principles delineated in *S.K.L.R.* We are not in a position to make close calls, particularly in a case such as this, where the orphans' court has a "longitudinal" understanding of the case. Even if we would have made a different conclusion based on the cold record, we are not able to reweigh the evidence. *See S.K.L.R.*, 256 A.3d at 1123-1124. As such, we conclude the record supports the orphans' court's decision to deny CYF's termination

petition under 23 Pa.C.S.A. § 2511(b). The orphans' court operated within its discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  01/25/2022